J-S34038-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TRAVIS ALTLAND | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JESSICA DIEHL | : | |
| | : | |
| Appellant | : | No. 966 MDA 2021 |

Appeal from the Order Entered June 30, 2021
In the Court of Common Pleas of York County Civil Division at No(s):
2018-FC-183-03

BEFORE:  DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:      **FILED: MARCH 3, 2022**

In this litigious custody matter, Jessica Diehl (Mother) appeals from the final order entered in the York County Court of Common Pleas, granting Travis Altland (Father) sole legal custody regarding decision-making[1] and primary physical custody, subject to Mother's unsupervised physical custody rights of the parties' minor child, C.A. (Child or the Child), born in March 2015.[2] Mother

---

[1] The court awarded the parties shared legal custody for purposes of obtaining information, being able to attend conferences and activities, and for procuring records, like medical, dental, educational, counseling, and similar records. See Order, 6/30/21, at 2-3.

[2]  As recently explained in *Graves v. Graves*, 265 A.3d 688 (Pa. Super. 2021):

> We use the parties' names in the caption "as they stood upon the record of the trial court at the time the appeal was taken" pursuant

*(Footnote Continued Next Page)*

avers: (1) the trial court failed to properly consider all the custody factors in the Child Custody Act, 23 Pa.C.S. § 5328, when fashioning its order; (2) the court erred by finding her in contempt for changing Child's school without Father's knowledge and purportedly encouraging a third party to post on social media when the weight of the evidence did not warrant such a finding; (3) the court imposed too severe a punishment on Mother when finding her in contempt of court; (4) the court erred by finding Mother was emotionally abusive towards Child when the weight of evidence did not support such a finding and was made without expert testimony; (5) the court erred and abused its discretion by substantially changing Mother's custodial time in its

_____

to Pa.R.A.P. 904(b). We note that recent changes to our Rules of Appellate Procedure provide that "[i]n an appeal of a custody action where the trial court has used the full name of the parties in the caption, upon application of a party and for cause shown, an appellate court may exercise its discretion to use the initials of the parties in the caption based upon the sensitive nature of the facts included in the case record and the best interest of the child." Pa.R.A.P. 904(b)(2); *see also* Pa.R.A.P. 907 ("When an appeal is filed in a custody action, upon application of a party and for cause shown the appellate court may make a determination that using the parties' initials in the caption is appropriate after considering the sensitive nature of the facts included in the case record and the child's best interest."). These changes to our Rules were approved on October 22, 2020, effective January 1, 2021[.]

*Graves*, 265 A.3d at 688 n.1. Here, Mother filed her notice of appeal on July 21, 2021, which is after the change went into effect. Neither she nor Father have applied to this Court for the use of initials in the caption. Nevertheless, we will refer to the minor child at issue by her initials or as "Child" throughout our decision.

April 1, 2021, temporary order without giving Mother an opportunity to be heard and only considering evidence from Father's case-in-chief; and (6) the court showed partiality, prejudice, bias, and/or ill will against Mother in rendering its decision. **See** Mother's Brief at 2-3.[3] After careful review, we affirm.

A panel of this Court set forth the relevant prior procedural history in an earlier custody decision involving Mother's request for relocation:

> Mother and Father resided in York, Pennsylvania, when [Child] was born. The parties ended their relationship in December 2017. On February 26, 2018, the parties entered into a stipulated custody agreement, which provided for shared legal and physical custody of [Child].
>
> In July 2018, Mother married and moved to Danville, Pennsylvania, to reside with her new husband. In April 2019, Mother and her husband [at the time] moved to Bloomsburg, Pennsylvania.[2] Mother did not provide statutory notice of relocation to Father prior to either of these moves.
>
> ---
>
> [2] Both Bloomsburg and Danville are approximately a two-hour drive from York.
>
> ---
>
> On September 4, 2019, Father filed a petition for special relief, raising the issue of Mother's relocation and seeking relief due to Mother's violation of the parties' custody agreement. The [trial] court held a hearing on this petition on October 18, 2019, after which the court entered an order continuing the matter,

---

[3] Father filed a *pro se* letter stating while he disagreed with Mother's position, he did not intend to participate in the appeal process or file an appellee's brief. **See** Letter from Travis Altland to Jennifer Traxler, Esquire, Deputy Prothonotary, 8/25/2021.

setting a new custody schedule, and requiring Father's custody be supervised.[3]

_____

[3] [Child] suffered a broken collarbone while in Father's custody, apparently from falling out of bed. Additionally, York County Children, Youth and Families (CYF) received a referral regarding "pornographic pictures that supposedly may have been taken by an eight-year-old half[-]sibling and that the caseworker talked to [F]ather about the photos and appropriate supervision for [Child] and her being able to access an iPad that had those on [it]." A Childline report of abuse was determined to be unfounded. In fact, Mother testified Father had told her about the pictures he had found. The trial court, noting on the record that there was no medical evidence suggesting abuse, stated: "I am finding as a matter of fact that there was no harm by [F]ather whatsoever relative to the collarbone or to any pictures that may have been taken by the eight-year-old[,] so those simply are not issues anymore."

[Moreover, during this time, Mother filed temporary protection from abuse (PFA) petitions on behalf of Child and herself against Father on July 12, 2020. A temporary PFA order was issued. On October 19, 2020, the trial court denied the order on the basis that the report was deemed to be unfounded.

Father also filed two PFA petitions against Mother and her then husband on July 14, 2020. The court denied the petitions and Father subsequently withdrew them.]

_____

On December 5, 2019 and January 22, 2020, the court held hearings on Father's petition for contempt and Mother's petition for relocation. Mother and Father both testified, as did Mother's [then] husband, Mother's mother-in-law, Father's mother, CYF caseworker Kala Ciletti, and Detective John Bumsted, who investigated the abuse report with respect to [Child's] broken collarbone.

On January 24, 2020, after considering the testimony and statutory custody and relocation factors, *see* 23 Pa.C.S.A. §§ 5328, 5337, the court entered an order awarding Mother and

Father shared legal custody, awarding Father primary physical custody and Mother partial physical custody during the school year, and awarding the parties shared physical custody during the summer (two weeks with Mother and one week with Father, throughout the summer). The court denied Mother's petition for relocation and required the parties to engage in co-parenting counseling. The court also found Mother in contempt and ordered her to pay $500 toward Father's attorneys' fees and the first $1,000 toward the cost of co-parenting counseling.

*T.A. v. J.D.*, 296 MDA 2020 (unpub. memo. at 2-4) (Pa. Super. July 27, 2020) (citations omitted).

Mother then appealed the court's January 24, 2020, order. She alleged the following: (1) the trial court erred by considering relocation despite the fact that the parties had discussed the move and modified the custody schedule as a result of the move; (2) the court abused its discretion in determining a drastic change in custody after the first half-day of trial; and (3) the court erred by considering various facts that were either inaccurate or not supported by the testimony. *See T.A.*, 296 MDA 2020 at 4. Mother also appealed the contempt order, alleging there was no evidence of her intent to violate the order. *Id.* at 10.

In affirming the trial court's decision, a panel of this Court concluded: (1) Mother did not comply with the form and time requirements for notice of relocation as set forth in 23 Pa.C.S. § 5337(c) and she did not inform Father of her second move until after the fact; and (2) her claim regarding a drastic change in custody was "meritless" and "baseless" considering the totality of the circumstances. *See T.A.*, 296 MDA 2020 at 6-9. The panel also

determined that the record supported the court's finding of contempt where it was "undisputed that Mother was subject to the stipulated custody order and was aware that it specified that she and Father shared legal custody." ***Id.*** at 11. As a result, the panel further concluded, "Mother was required to inform Father about enrolling [Child] in counseling, speech therapy, and the Head Start program, and yet she proceeded to make unilateral decisions affecting [Child]'s education and welfare. Mother's intent can be inferred from her actions." ***Id.*** at 11-12.

Subsequently, Father filed a petition for modification and contempt on October 21, 2020.[4] Mother filed an answer to Father's petition for modification and contempt with new matter. She denied taking any action, including filing the PFA petitions and reports of child abuse, for the purpose of alienation or damaging the relationship between Father and Child. Mother also alleged that she did not engage in any intentional action other than to protect Child. In her new matter, Mother requested the custody order include a provision that required the parties to enroll Child in counseling because Mother believed it was in Child's best interest to ascertain why the child was making "concerning statements to Mother and others if these statements [were] determined not

---

[4] Father also filed a conciliation conference memorandum on that same day, requesting that Mother's physical custody rights be suspended or curtailed, that she and her husband at the time undergo complete psychological evaluations, that Mother undergo a threat of harm evaluation to determine if she is a continued threat to Child, and that she again be held in contempt.

to be accurate." Mother's Answer to Father's Petition for Modification and Contempt with New Matter, 11/4/20, at ¶ 51. Mother also countered with her own motion for contempt against Father for not allowing her to exercise shared legal custody because she claims Father "unilaterally decid[ed] to change the . . . Child's doctor without Mother's consent" and denied her physical custody of Child one weekend in May 2020. *Id.* at ¶ 69.

The court then scheduled the matter for trial in April 2021.[5] On April 1st, the court held the first day of trial. Father had completed his case-in-chief but Mother had not done so. "[O]ut of an abundance of caution, the Court temporarily made Mother's rights of visits supervised until the trial could be finished." Trial Ct. Op., 7/30/21, at 2. The court opined it was taking this action "because there [was] a potential that after hearing all of the testimony . . ., [it] may find emotional abuse by Mother." Order, 4/6/21, at 2. The second half of the trial was originally scheduled for seven days later, but due to Mother's counsel's request, it was continued until June 23, 2021.

During this time, Mother filed a motion for reconsideration of the court's April 1st temporary order.[6] The court denied the motion on May 4, 2021. *See*

---

[5] Prior to the first proceeding, Mother left her husband, Dustin Diehl, and moved back in with her parents.

[6] Mother also obtained new counsel. *See* Praecipe to Withdraw Appearance/Praecipe for Entry of Appearance, 4/30/21.

Order of Court, 5/4/21. On June 23rd, the court concluded the trial and entered the following final order:

> The [c]ourt does find [M]other in contempt for not advising [F]ather about changing [Child]'s school when she did that and, secondly, the [c]ourt finds [M]other in contempt for encouraging [her estranged mother-in-law] to post disparaging remarks that disparaged [F]ather.
>
> Since this is a second contempt for [M]other, we find the sanctions to be that she shall reimburse to [F]ather or [F]ather's attorney the sum of $5,000 in attorneys' fees at the rate of $100 monthly. The first monthly payment will be on August 1, 2021 and $100 per month the first day of each month thereafter until the entire amount is paid.
>
> We set this amount based on [M]other's own testimony of what she's paid at her job and we warned [M]other that if there is ever a third contempt, incarceration is almost a certainty if, after a hearing, she would be found in contempt a third time.
>
> The [c]ourt finds [F]ather not to be in contempt.
>
> Relative to the custody order itself, the [c]ourt awards sole legal custody to [F]ather for decision making but awards shared legal custody to both parents for purposes of getting information, being able to attend conferences and activities, for getting records, medical, dental, educational, counseling and similar records. So for all information gathering and recordkeeping purposes, the parties have shared legal custody, but [F]ather has sole legal custody for decision making.
>
> The Court awards [F]ather majority physical custody. [M]other will have the following rights of partial physical custody, which will be unsupervised:
>
> [M]other will have Fridays at 7:00 p.m. until Sunday at 7:00 p.m. the first, second, and fourth weekends of each month, staying with the current schedule of when her weekends will be and with Friday continuing to define the weekend.

All this is, of course, really a continuation of the order of January 22, 2020. However, this will be the schedule year round, so [M]other does not get any extra time during the summer.

Holidays, including Thanksgiving and Christmas, will be as set forth in the January 22nd, 2020 order, and presumably the schedule of that can continue on as it has been.

Transportation will be shared by the party obtaining custody of [Child] going and picking up [Child] at the residence of the other party.

All other York County provisions set forth in the January 22, 2020 order are reconfirmed as those stated herein in full.

The [c]ourt does make a finding that [M]other has emotionally abused the [C]hild. The [c]ourt is giving her unsupervised partial custody because the [c]ourt is hopeful that [M]other has learned her lesson, but the [c]ourt does warn [M]other that if there is any future emotional abuse of this [C]hild by [M]other or by her family members with her knowledge and permission or encouragement or acquiescence, that we may go back to supervised visits instead of unsupervised partial physical custody.

Order, 6/30/21, at 1-4. This timely appeal followed.[7]

Mother raises the following issues on appeal:

I. Whether the trial court failed to correctly consider all custody factors in 23 Pa.C.S.A. § 5328 in light of all relevant evidence when fashioning the custody order reducing Mother's custodial time with the Child[?]

II. Whether the trial court erred in finding Mother in contempt for changing the Child's school and allegedly encouraging a third part to post on social media when the weight of the evidence did not warrant a finding of contempt[?]

---

[7] Mother complied with the court's order and filed a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

III.    In the alternative, whether the trial court imposed too severe a punishment on Mother when finding her in contempt of the court's order[?]

IV.    Whether the trial court erred in finding Mother emotionally abusive when the weight of th[e] evidence did not support such a finding and a trial court cannot solely find a parent to be emotionally abusive without testimony from a professional[?]

V.    Whether the trial court erred as a matter of law and abused its discretion when entering an order substantially changing Mother's custody without giving Mother an opportunity to be heard and only considering Father's case in chief[?]

VI.    Whether the trial court showed partiality, prejudice, bias, and/or ill will against Mother in the rendering of its decisions throughout the case based upon the evidence and history of the case[?]

Mother's Brief at 2-3 (some capitalization omitted).

We begin with our well-settled scope and standard of review concerning

custody orders:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**S.T. v. R.W.**, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted).

> The [Child Custody] Act defines the various forms of custody as the "right" of a party to make decisions for the child, or to

- 10 -

exercise physical control over the child. [23 Pa.C.] § 5322. Thus, in ordering a form of custody, the trial court dictates which party has the right to custody.

When a trial court orders a form of custody, the best interest of the child is paramount. *J.R.M. v. J.E.A.*, 2011 PA Super 263, 33 A.3d 647, 650 (Pa. Super. 2011). To determine the child's best interest, the trial court must consider the following 16 factors when "ordering any form of custody[ by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child."] 23 Pa.C.S.A. § 5328(a). Those factors are:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

*S.W.D. v. S.A.R.*, 96 A.3d 396, 400-01 (Pa. Super. 2014) (footnote omitted).

Notably, the "parties cannot dictate the amount of weight the trial court places on evidence." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citation omitted). Moreover, "[i]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (citation omitted).

After a court has conducted its analysis based on the sixteen custody factors, it "shall delineate its reasons for its decision on the record in open

court or in a written opinion or order." 23 Pa.C.S. § 5323(d). This Court has previously explained:

> In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*D.Q. v. K.K.*, 241 A.3d 1112, 1118 (Pa. Super. 2020) (citations and quotations marks omitted). "Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion." *A.V.*, 87 A.3d at 820 (citation omitted).

Here, Mother first alleges the trial court failed to properly consider and analyze all the factors in Section 5328 of the Child Custody Act. *See* Mother's Brief at 8. Specifically, she contends there was no testimony at the trial indicating that she was unable to share legal custody decisions with Father. She places blames on Father, stating:

> To the contrary, Father testified that he did change the child's doctor without consulting Mother first because she lived so far away. There was no other testimony from Father that Mother thwarted any legal custody decisions or arbitrarily made it difficult for the child to receive medical care or education opportunities. The only item the parties disagreed upon was counseling for the child. Mother believed the child would benefit from counseling and Father testified that he did not think the child needed any counseling.

- 13 -

*Id.* at 11. Moreover, Mother asserts that her reduction in physical custody periods "appears to be done in [an] attempt to punish Mother rather than for the best interest of the Child." *Id.*

In terms of the Section 5328 custody factors, Mother contends that the only real substantial change in the parties' situation since the court's prior determination is that Mother left her abusive husband and returned to the area where her family resides to re-establish herself and to be closer to Child. *See* Mother's Brief at 12.

Furthermore, as for the specific factors, Mother alleges the following. As to factor two (present and past abuse committed by a party or member of the party's household), Mother claims the court incorrectly found Mother emotionally abused Child which was contrary to "legally established principles" and should not have weighed in Father's favor. *See* Mother's Brief at 12. In terms of factor three (parental duties performed by each party), Mother argues there was uncontroverted testimony that Mother performed duties for Child when she exercised custody and therefore, the court should have found the factor to be neutral rather than favoring Father. With respect to factor four (the need for stability), Mother states the court incorrectly relied on information that she moved five or six times in the past few years because her "'moves' were only in two different areas[.]" *Id.* at 13. In terms of factor eight (the attempts of a parent to turn the child against the other parent), Mother states the court's erroneous reasoning for finding against her

"centered around a Facebook post[8] that Mother did not know existed and a report made to CYF about Paternal Grandmother's daycare, which Mother also did not know occurred." *Id.* She claims there was no other testimony indicating that she "actively attempted to turn the [C]hild against Father." *Id.*

---

[8] At issue, Mother's then mother-in-law posted the following to Facebook on February 17, 2019:

> I usually don't post personal things on here but I feel I have no choice. There is a 5 year old little girl that I know personally. She made physical (broken bone) and sexual abuse allegations against her own father. This little one has been fighting for over a year for someone to listen to her and has not changed her story at all. She told a crisis counselor and even in a CAC interview but it's never enough. Always an excuse why no arrests are made. The things this kid has disclosed put a knife through my heart. Something really bad is happening in York County Pa. I have never seen the corruption in family courts that I had witnessed there. Is this another "kids for cash" using family courts? I'm talking about a mother who has never even had a parking ticket, got her child taken from her because she believed and tried to protect this child. The lies are in the court transcripts. Who is benefiting from this? The game is [clever.] They try to financially drain the mothers by slapping them with bogus contempt of court like, putting your child in counseling and getting speech therapy. Then they are ordered to pay $1000 cash to a "court appointed family therapist" regardless of insurance. Payments to the opposing attorney. Is this the pay off?? Why can't ANYONE investigate this??? Calls and emails were sent to everyone in these agencies to file complaints/reports (CYS, Attorney General, State Auditor, Newspapers . . . etc.) but the usual answer from Pennsylvania is "oh we don't handle these things." Are they scared??? Really?? Then can someone, anyone, tell me who the hell does?? Should we sit back and wait once again until another child goes missing or dies? If anyone can help or knows anyone you think can help, please let me know.

*See* Father's Petition for Modification and Contempt, 10/21/20, at Exhibit B.

Lastly, as to factor thirteen (the level of conflict between the parties), Mother argues that in finding this factor favored Father, the court improperly focused on the fact that she filed a protection from abuse (PFA) petition against Father on behalf of Child, which was not based upon "nefarious circumstances[,]" but rather a disclosure made to Mother by Child. *Id.* at 14. Mother avers that "Father retaliated and filed two PFA petitions against Mother and her then [h]usband." *Id.* Mother concludes that the court clearly erred in its analysis and the order at issue should have maintain the custody arrangement as set forth in the previous January 24, 2020, order. *Id.*

Mother's allegations, in essence, amount to a dispute concerning the court's findings and determinations regarding the credibility of witnesses and weight of the evidence. Impliedly, Mother would like this Court to reweigh the evidence and reassess the Section 5328 factors in her favor.

As to issues concerning credibility and weight of the evidence, we reiterate our standard of review, which dictates that "we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand" absent an abuse of discretion. *S.T. v. R.W.*, 192 A.3d at 1160. We further observe:

> It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party.

*King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (citation omitted).

The record reveals that at the June 23, 2021, proceeding, the trial court exhaustively considered each of the 16 custody factors listed in section 5328(a):

[Factor o]ne, which party is more likely to encourage and permit frequent and continuing contact between the child and the other party. Candidly, the Court is very impressed with [F]ather and his mother and how they got the supervised visits off quickly.

They had them – candidly, for the supervisor, six hours each is a fairly substantial amount of time. Father obviously took his responsibility to be sure the child saw [M]other as much as possible, he took that seriously, so we find that factor in favor of [F]ather.

Two, the present and past abuse committed by a party. We did find emotional abuse by [M]other towards the [C]hild. The [c]ourt believes that [M]other does not understand what the [C]hild goes through when there are investigations and filings and so forth.

The [c]ourt believes that when [M]other lost majority custody back in 2020, that [M]other was on some kind of campaign to revenge or something as a result of that and really did make [F]ather's life very miserable and thereby [Child]'s life very miserable as [F]ather testified when we were here on April 1st.

[F]ather's testimony was very convincing that [M]other's attempts to alienate [Child] against her father have made his life quite miserable and, again, thereby vicariously made [Child]'s life miserable.

Paragraph 2.1 is information relative to child abuse and involvement of protective services. Of course there was some involvement with protective services, but there were no indicated findings.

However, others involving all kinds of law enforcement and PFAs not directly necessarily contacting protective services, but the [c]ourt can't help but notice that [Mother] got her [then] husband to contact protective services and somehow thought that

was okay even though that was different than her calling protective services. Anyway, it's not really a factor.

Factor number three, the parental duties performed by each party on behalf of the [C]hild. Clearly both parties have been able to perform the parental duties on behalf of this [C]hild, so we find that really a neutral factor. Father seems to have been doing a very good job the last year and a half, and therefore that factor will be slightly in favor of [F]ather but not heavily.

Factor number four, the need for stability and continuity in the [C]hild's education, family life and community life. Mother has moved all over the place, and the [c]ourt found [M]other's testimony ironic that she's going to stay where she is now with her parents in Columbia, Pennsylvania and that's where she's going to stay, because the [c]ourt heard her say that in prior hearings about other various addresses and she has lived in five or six different locations in just a couple of years. So that is definitely a factor in favor of [F]ather.

Factor number five, the availability of extended family. Both [M]other and [F]ather have extended family that are very involved with this [C]hild's life, and that's a positive for the most part.

Unfortunately, there have been times when [M]other has gotten other people in her life, whether it's her now estranged husband or her mother, to get too involved in this [C]hild's life which, unfortunately, is typical for [M]other.

She is somewhat enmeshed with her child and doesn't quite understand how that's harmful to her child, but most of the time most of the extended family relationships are positive, and therefore that's a relatively neutral factor.

Factor number seven, the preference of the [C]hild. The [c]ourt did not interview the [C]hild because of her tender age, and therefore that's not a factor.

Factor number eight, the attempts of a parent to turn the child against the other parent. This is a very important factor in this case as [M]other has steadfastly tried to turn the [C]hild against [F]ather and had various members of her family do likewise.

This is definitely a factor in favor of [F]ather, who is exactly the opposite, who tries very much to enhance [Child]'s relationship with her mother. The [c]ourt was dismayed and couldn't help but notice that [M]other endorsed or acquiesced or encouraged her then mother-in-law, now of course estranged mother-in-law, to post some very negative things on social media about [F]ather.

That is only one -- additionally, it's not totally clear exactly what [M]other did, perhaps through other family members, but to have paternal grandmother's child care investigated is reprehensible. And we heard testimony on that back on April 1st. And those are not the only attempts that [M]other has made to turn the [C]hild against [F]ather and [F]ather's family.

Factor number nine, which party is more likely to maintain a loving and stable, consistent and nurturing relationship adequate for the child and the child's emotional needs. The [c]ourt did really comment on that in factor four about stability.

This a factor heavily in favor of [F]ather. Certainly [M]other's now being estranged and eager to file for divorce against her present husband is not a sign of stability by any means, so, again, that's a factor in favor of [F]ather.

Factor number ten, which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. Both parties do attend to those pretty well.

Father certainly is the majority custodial parent for most of the last year and a half, has had a better opportunity to do that, and this [C]hild has apparently thrived in that year and a half. So while [M]other is a good mother in many ways, even this factor is very slightly in favor of [F]ather.

Factor number 11 is proximity of the residences of the parties. Mother has moved back in with her parents in Columbia, so the residences of the parties are not nearly as far apart as they were, and the [c]ourt believes that probably was a wise move on [M]other's part.

But given [M]other's track record, the [c]ourt cannot help but ponder whether or not [M]other will remain there or go to

some other residence as her housing stability has been extremely unstable. In any event, this factor is not a factor in this case.

Factor number 12, each party's availability to care for the child and make appropriate child care arrangements. Again, there is a lot of positive extended family for child care arrangements, so that's a good factor for both parties and therefore a neutral factor.

Factor 13, level of conflict between the parties, the willingness and ability to cooperate with one another. This unfortunately is a large part of the crux of this case there has been a lot of conflict. The [c]ourt notes that the prothonotary's file is now on file three of three, each filing being at least four or five inches thick.

Candidly, the [c]ourt cannot blame all of the conflict on [M]other as [F]ather has made a few poor choices along the way also, but a large majority of it has been [M]other's doing or initiating. But we commented on this before, so this factor, though in favor of [F]ather, has already been commented on.

Factor 14, the history of the drug and alcohol abuse. We hear no testimony on that.

Factor 15, the mental and physical condition of a party or party's household. We heard no testimony on that.

The [c]ourt does opine that [M]other's attitude that she can do no wrong and she has an excuse for every decision that she makes that turns out poorly does make the [c]ourt recommend to [M]other she probably could really benefit from some counseling.

Factor 16, any other relevant factor. There's no other relevant factor. . . .

N.T., 6/23/21, at 135-41. After the court was notified that it missed factor six, it made the following comment: "I'll go to factor six, the child's sibling relationships. The [C]hild has sibling relationships on both sides, [M]other's and [F]ather's. They are positive, therefore it's a neutral factor." *Id.* at 142.

After a careful review of the record, we find ample support in the trial court's analysis for its decision to award sole legal custody regarding decision making to Father and to modify Mother's already partial physical custody.[9] Notably, Mother is only attacking the court's findings as to five of the 16 factors. The court engaged in the required custody best interest consideration, analyzed each of the custody/best interest factors pursuant to Section 5328(a), and, we note, found a majority of the factors weighed in Father's favor. Nevertheless, it is evident the court considered and credited Mother's testimony and evidence in addition to Father's testimony and evidence. However, it was within the court's purview as the fact-finder to determine which factors were "most salient and critical" based on this particular case. *See M.J.M.*, 63 A.3d at 339.

Additionally, we find unpersuasive Mother's arguments with respect to factors two, three, four, eight, and thirteen, particularly in light of the fact that the trial testimony established: (1) Child and Father's other child had been subjected to multiple CAC interviews based on multiple reports of physical and sexual abuse, including three in July of 2020, made by Mother and her then husband that were investigated by police and other governmental agencies

_____

[9] The only real change from the prior order to the order at issue is the court denied Mother extra time during the summer months. *See* Order, 6/30/21, at 3.

and ultimately determined to be unfounded;[10] (2) Mother reviewed and approved of her then-mother-in-law posting on social media about the allegations of sexual and physical abuse;[11] (3) Mother admitted she had moved five times since 2018 and was currently living with her parents since she left her husband, **see** N.T., 6/23/21, at 48 ; (4) Mother never told Father that she was changing Child's school prior to making the decision;[12] (5) Father made the change regarding Child's physician because Mother had been taking Child to a Bloomsburg area doctor, nearly two hours away, but he admitted that he made the decision without Mother's agreement, **see** N.T., 4/1/21, at 191-92; (6) Mother did not take responsibility for what has happened to Father in terms of the physical and sexual abuse allegations because she

---

[10]  Similar allegations were made in 2019, which were disposed of at that time. N.T., 4/1/21, at 57.  Police also investigated a report made by Mother's then-husband against Father's mother in October 2020, in which the husband accused the paternal grandmother of slapping Child.  **Id.** at 41-43.  No charges were ever brought against the paternal grandmother.   Mother's former husband also filed a complaint against the police for their handling of the situation.  **Id.** at 43-44.

[11]  Mother tries to downplay the effect of the post because she said that no names were mentioned but the post does reference a five-year-old child who is close to the mother-in-law and the post refers to allegations that the child made "against her own father."  N.T., 4/1/21, at 197.  **See also** Father's Petition for Modification and Contempt, 10/21/20, at Exhibit B

[12]  We note Mother attempted to text Father with the information, but Father would not contact Mother due to the PFA order against him.  His counsel sent Mother's counsel a letter acknowledging the situation.   Mother never requested her counsel contact Father's counsel about the change in schools.

believed that what was best for Child was to find out why the child was making the allegations even though Mother also testified that she believed Father did not do anything intentionally to Child, *see* N.T., 6/23/21, at 81-83; and (7) Child is thriving in her present environment where she sees her other siblings and close relatives and attends school, *see i.e.*, N.T., 4/1/21, at 135-38 and 162-63. As such, Mother has not demonstrated that the trial court's conclusions are unreasonable in light of the record evidence. ***See S.T.***, 192 A.3d at 1160. Accordingly, Mother's challenge to the trial court's weighing of the custody factors lacks merit.

In her second argument, Mother asserts the court erred in finding her in contempt for changing Child's school without Father's consent and for encouraging a third party, her estranged mother-in-law, to post on social media about Father's alleged abuse of Child when the weight of the evidence did not warrant such a finding. ***See*** Mother's Brief at 15. With respect to changing Child's school, Mother asserts that at the time, the July 2020 temporary custody order granted her primary, physical custody and that school year was going to start one month later. ***Id.*** at 16. Mother alleges that she attempted to enroll Child[13] into a cyber academy where Father resided, "but was unable to do so since she did not reside in the district." ***Id.*** She further avers:

---

[13] Child was five years old at the time.

> With no other choice and school beginning, Mother enrolled the Child in Southern School in Columbia County. Prior to this time, Mother had reached out to Father with other updates regarding the child and was told to stop texting him by his attorney. In fact, on August 3, 2020, [she states] Father's attorney specifically wrote, "your client has been texting father and contacting him. There is a PFA in effect. She is to immediately stop texting him unless and until the case is over. He will not violate the order in effect."

*Id.* at 16-17 (reproduced record citations omitted). Mother claims her actions were "not done with wrongful intent" because she "had no choice" to enroll Child in that other school. *Id.* at 17.

As for the social media post, Mother contends that based on her former mother-in-law's own testimony, Mother never told the mother-in-law "what to put in the post nor to post anything to social media about the situation happening with Father and the alleged abuse to the child." Mother's Brief at 18 (reproduced record citation omitted). Mother also mentions Father testified that "the post did not name him or any identifying information for viewers of the post to even know who the post would be about." *Id.* (reproduced record citation omitted). Additionally, she points to her own testimony, in which she averred that "she did not have social media, did not know anything was being posted to social media, and in fact[,] saw the post for the first time in [c]ourt at the final PFA [h]earing." *Id.* (reproduced record citation omitted). Mother concludes that she "did not act to encourage anyone . . . to post disparaging remarks about Father[, and even had she done so,] the post had no identifiers tying it to Father, Mother, or the child in this case." *Id.*

- 24 -

Our standard of review concerning a trial court's contempt findings is very narrow:

> This Court's review of a civil contempt order is limited to a determination of whether the trial court abused its discretion.  If a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, then discretion is abused.

*B.A.W. v. T.L.W.*, 230 A.3d 402, 406 (Pa. Super. 2020) (citation omitted).

"To sustain a finding of civil contempt, the complainant must prove certain distinct elements by a preponderance of the evidence:  (1) that the contemnor had notice of the specific order . . .which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent."  *P.H.D. v. R.R.D.*, 56 A.3d 702, 706 n.7 (Pa. Super. 2012) (citation omitted).  Moreover, "[a] court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment.  A party must have violated a court order to be found in civil contempt."  *Garr v. Peters*, 773 A.2d 183, 189 (Pa. Super. 2001) (citation omitted).

Nevertheless,

> a showing of non-compliance is not sufficient in itself to prove contempt.  If the alleged contemnor is unable to perform and has in **good faith** attempted to comply with the court order, contempt is not proven.  The alleged contemnor has the burden of proving the affirmative defense that he has the present inability to comply with the court order.  A court cannot impose a coercive sentence

- 25 -

conditioned on the contemnor's performance of an act which is incapable of performance. . . .

***Sinaiko v. Sinaiko***, 664 A.2d 1005, 1009-10 (Pa. Super. 1995) (emphasis in original; citations and quotation marks omitted).

Regarding Mother's decision to change Child's school without Father's consent, a review of Mother's testimony at the June 23, 2021, trial proceeding reveals the following. On direct examination, Mother testified that she going to enroll Child in a cyber school in the school district where Father resided, but since she did not live in the same county, Mother was unable to keep Child enrolled there and had to enroll Child in the county where she resided. ***See*** N.T., 6/23/21, at 18. Mother testified that she reached out to Father with the updated information, but her counsel received an email from Father's counsel on August 3, 2020, stating that she should stop contacting him because the PFA order against him was in effect. ***Id.*** at 19-20. Mother never asked her counsel to contact Father's counsel about the change in schools. Moreover, on cross-examination, the following exchange took place between Father's counsel and Mother:

> [Father's counsel]: Now, you enrolled [Child] into school up in Catawissa. Is that correct?
>
> [Mother]: Correct.
>
> [Father's counsel]: And you did not tell [Father] in advance that you did so, correct?
>
> [Mother]: Correct.

\*   \*   \*

[Father's counsel]: And when you finally did notify [Father] of the school, the exact school, it wasn't until October of 2020, well after school started and when he was to get custody back. That's the first time you told him where she was going to school, correct?

[Mother]: Correct.

N.T., 6/23/21, at 54-55.

As for the social media post, a review of the record reveals that at the April 1, 2021, trial proceeding, Mother's former mother-in-law, Heidi Semiclose, testified, *via* video conference, to the following:

[Father's counsel]: [F]or the Judge's edification, it's Exhibit D of our exhibit pack. [Semiclose], I want to ask you to verify if this was your [social media] post? . . . I'm not trying to get you into trouble with the Court, and you're not up for any kind of sanctions by the Court, but I wanted to know if this was a post that you had made.

[Semiclose]: Yes.

[Father's counsel]: It was?

[Semiclose]: Yes, that was -- I don't even know when it was, I can't remember, but at that time I was doing anything I could to help [Mother]. I mean, she was very upset crying. I mean, I got calls from her so much and texts and basically just trying to do anything we could really to help her, because it was horrible, it is just a horrible, horrible thing. You know, that was just, hey, does anyone have ideas? I mean, I didn't name anybody or anything like that, . . . I just did anything I could to help her, because I really felt bad for her. It was, I mean, it's just a horrible thing going through something like this.

[Father's counsel]: Now the post -- did [Mother] know that you were making it?

[Semiclose]: Yeah, I sent it to her before I put it up.

[Father's counsel]: So she approved it before you put it up?

- 27 -

[Semiclose]: Yeah, because I didn't want to say anything wrong.

[Father's counsel]: Sure. Did she ever request that you take it down?

[Semiclose]: No.

* * *

[Semiclose]: No, in fact, I can't even find it now.

[Father's counsel]: Did she ask you to do anything else on her behalf?

[Semiclose]: No, not with that, not with that. That was just, you know, seeing if there was any resources or whatever the case may be. [Mother], you know, she had talked to a lot of people through [B]eyond [V]iolence [Women's Center] and different things like that, so she had it pretty good. She was able to find, you know, what she needed or whatever to help with this situation.

[Father's counsel]: Okay. Other than that post that she reviewed in advance, which I had already instructed the Judge to tell him it was Exhibit D of our packet, did she ask you to do any other postings on social media or contact any other people?

[Semiclose]: No, there was never any other postings except for that one, ever. After that, that is when I removed myself from everything and after being up there and everything else, I just kind of removed myself from everything, because it's just going nowhere.

[Father's counsel]: What do you mean by that exactly, when you say it's going nowhere?

[Semiclose]: Just there is nothing -- this is just something that, I did what I could for [Child], and there is just nothing else I can do. Personally, I can't do anything else to help that little girl. I mean, I removed myself from the whole situation, because there is absolutely nothing else that I can do [to] help her. I tried and I can't do anything else. That [post] was back in what, 2019?

- 28 -

[Father's counsel]: Yeah, it looks like it was 2019, yes. I am looking at, and you can see on the exhibit there is some dates in there. I wanted to ask you is Alex Lorison, are these relatives that also made comments?

[Semiclose]: That is my daughter. She would be -- because to tell you the truth, and to be honest, a lot of people do not know my son's wife, they don't know [Mother]. Since I'm not in Pennsylvania, I don't live there, most people don't even know he's married.

[Father's counsel]: Okay. But just to be clear, [Mother], after she approved it, she never told you to take it down?

[Semiclose]: No.

N.T., 4/1/21, at 151-54.

Subsequently, at the June 23rd proceeding, Mother testified to the following:

[Father's counsel]: . . . So the posting that Heidi Semiclose made she said that you approved. If you recall from her testimony, she said that you approved the posting before she posted it.

[Mother]: Correct.

[Father's counsel]: So you called her as a witness in the first trial on your behalf, didn't you?

[Mother]: Correct. That was before I left her son.

[Father's counsel]: So now are you saying that she just made that up?

[Mother]: Correct.

[Father's counsel]: And you saw the posting, which was quite negative about [Father] with regard to [Child], wasn't it?

[Mother]: It didn't name him in the post that I recall seeing, but, like I said, I had saw that as an exhibit at the other final PFA hearing.

- 29 -

[Father's counsel]: And even though it didn't reference him by name, it referenced the father of the child, didn't it?

[Mother]: Yes, but there was no names that were named in that post from what I recall.

[Father's counsel]: And you don't think that was a derogatory post about [Father]?

[Mother]: Like I said, she didn't name any names and I was unaware until after that it was clearly posted and used as an exhibit that it was made.

N.T., 6/23/21, at 53-54.

In explaining its rationale, the trial court noted that "Mother admitted to enrolling the child in school without telling Father[,]" and it also stated it "heard testimony of Mother encouraging or at the very least approving a social media post which was derogatory towards Father." Trial Ct. Op. at 9, 12. The court further stated "it was lenient in limiting the finding of contempt towards [Mother] especially as some of the issues were the same counts as her first contempt. Moreover, the [trial c]ourt . . . opine[d], once again, that Mother's argument that the [c]ourt erred in weighing the evidence at trial [was] not a reviewable issue on appeal." *Id.* at 12 (record citation omitted).

The record supports the court's findings of contempt. As noted in this Court's prior decision:

It is undisputed that Mother was subject to the stipulated custody order and was aware that it specified that she and Father shared legal custody. **See** 23 Pa.C.S.A. § 5322(a) (defining "Legal custody" as "the right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions.").

- 30 -

***T.A.***, 296 MDA 2020 at 11. In accordance with the order, she was required to inform Father about enrolling Child in the new school, and yet again, she made a unilateral decision which affected Child's education.

As for the social media post, the court was free to make credibility determinations and here, it found the mother-in-law's testimony, as opposed to Mother's statements, credible. ***See S.T.***, 192 A.3d at 1160. Mother's excuses for downplaying her involvement regarding the disparaging remarks made towards Father because he was not specifically named are unavailing. Accordingly, we conclude Mother had notice of the order at issue, her acts were volitional, and she acted with wrongful intent. ***See P.H.D.***, 56 A.3d at 706 n.7. Furthermore, Mother has not demonstrated she acted in good faith in attempting to comply with the court order. ***See Sinaiko***, 664 A.2d at 1009-10. Therefore, we discern no abuse of discretion, and Mother's second argument fails.

In her third claim, Mother raises an alternative argument to her prior claim, complaining that the sanctions levied against her by the trial court amounted to an abuse of discretion. ***See*** Mother's Brief at 20. Specifically, she states:

> [T]he $5,000.00 Mother is ordered to pay to Father's attorney for the contempt are punitive in nature rather than compensatory. Foremost, Mother works a job making $16.00 an hour and pays child support to Father in this case making the $5,000.00 sanction excessive for Mother's current financial position. Furthermore, the [t]rial [c]ourt on the record stated, "[Father] did a couple of things that probably were close to contempt, but Mother did some other

things that were probably close to contempt" making it clear that neither Father nor Mother in the [c]ourt's eyes were completely clean, so to speak. The [t]rial [c]ourt's own commentary infers that the sanction against Mother is punitive in nature in this case.

*Id.* (reproduced record citation omitted).

"The imposition of counsel fees can serve as a sanction upon a finding of civil contempt." ***Sutch v. Roxborough Memorial Hospital***, 142 A.3d 38, 68 (Pa. Super. 2016). The purpose of awarding counsel fees in this context is "to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary, such as the cost of the contempt hearing, so it can be coercive and compensatory but it cannot be punitive." ***Id.*** at 69. With respect to an award of contempt sanctions in the form of counsel fees, this Court's standard of review is an abuse of discretion. ***Mrozek v. James***, 780 A.2d 670, 674 (Pa. Super. 2001).

Here, Father testified that if he did it not file the petition for modification and contempt, "everything would keep going as it was before." N.T., 4/1/21, at 159. He also indicated that since he filed the petition, no reports have been filed and he has not received any calls from the police or CYF. ***See id.***, at 159-60. When asked how he was doing, Father stated, "It's just been a struggle. On the financial part of it going through all of the attorney's fees and court costs and all of that, I am in debt over my head right now fighting for my girl." ***Id.*** at 160. Father testified that he has spent over $22,000 in counsel fees since the first allegation of physical abuse regarding Child's collarbone was made. ***Id.*** at 186.

In finding that its contempt order was reasonable, the court stated:

It is denied that this [c]ourt erred in imposing a too severe punishment on Mother relative to her second contempt. First, this [c]ourt made this ruling based on Mother's own testimony on her earning capacity and her support payments.

Q. Okay. You say you have a new job now.[14] So you've had it I guess you procured it [at] the end of April of 2021. Is that correct?

[A. Correct.

\* \* \*]

Q. And how much are you making?

A. $16.60.

Q. Per hour?

A. Yes.

***See*** [N.T., 6/23/21, at 48-49] (noting Mother's pay rate and that Mother also makes a similar payment of $100 for child support)[.] Second, this was Mother's second contempt and it was apparent that Mother did not learn her lesson the first time and therefore the penalty needed to be higher so that Mother would not continue to disregard [the c]ourt order and further harm the well-being of the [C]hild. The [c]ourt would also note that the Mother's previous contempt were related to the very same issues, school and counseling, and therefore, Mother should have been far more cautious about repeating the same actions.

Trial Ct. Op. at 13 (some citations omitted).

The record supports the court's determination. Mother asserts she was

merely looking out for the best interests of Child as the basis for the repeated

_____

[14] Mother testified she was a medical office associate at Penn State Health's Lime Spring campus. ***See*** N.T., 6/23/21, at 8-9.

abuse allegations against Father. However, it is clear these reports and allegations were meant to harass Father as they stopped after he filed the petition for modification and contempt. Moreover, it merits emphasizing that this is Mother's second contempt finding, and that her first contempt finding, based on similar actions, was previously affirmed by this Court. **See T.A.**, 296 MDA 2020 at 10-12. We place great reliance on a court's discretion regarding contempt, and here, the trial court did not err or abuse its discretion when it found that the award of Father's counsel fees was a proper, compensatory sanction. As such, Mother's third claim has no merit.

Next, Mother claims the court erred in finding that she was emotionally abusive towards Child based on the weight of the evidence. **See** Mother's Brief at 21. She alleges "in order for a parent to be found emotionally abusive, it is required for a doctor or licensed psychologist to diagnose a child with one of the conditions" set forth in the Child Protective Services Law (CPSL). **Id.** at 22; **see also** 23 Pa.C.S. § 6303(a). Mother argues that in the present case,

> no testimony was provided by any medical professional that the [C]hild suffers from chronically and severe anxiety, agitation, depression, psychosis, or is socially withdrawn. Furthermore, no testimony was provided that the [C]hild's life or safety was threatened by Mother nor was any testimony proffered that the [C]hild has not been able to accomplish age appropriate developmental social tasks. In short, no testimony by a doctor or licensed psychologist was provided throughout the entirety of the record. In fact, both parents testified how great their daughter is doing. For instance, [Father] testified how great [Child] does in school and the relationship she has with her teacher. Additionally, Father testified that the child has friends at school and at daycare.

Finally, Father even testified that he [did not] believe the [C]hild needed counseling. Furthermore, Mother testified that the [C]hild is an outgoing, loving child, who [does not] exhibit any issues with development or mental illness. Despite the testimony from the [C]hild's parents that the [C]hild exhibits no signs of any conditions and without any testimony from any medical professionals that the [C]hild was suffering from any mental infirmities, the court, *sua sponte,* still found Mother to be emotionally abusive to the Child.

*Id.*

As noted above, Mother relies on the CPSL, citing Section 6303, which

provides, in relevant part:

**(b.1) Child abuse**.— The term "**child abuse**" shall mean intentionally, knowingly or recklessly doing any of the following:

\* \* \*

(3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act.

23 Pa.C.S. § 6303(b.1)(3). "Serious mental injury" is defined as follows:

A psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that:

(1) renders a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or

(2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S. § 6303(a) ("Serious mental injury") (emphasis in original).

Here, the trial court found the following:

First, this [c]ourt would opine that there does not seem to be any authority which states that a Court cannot make a finding of emotional abuse without the testimony of an expert. Moreover,

this [c]ourt does not believe that the discretion which the trial court holds in regards to experts support[s] such a conclusion.

Namely, the trial court wields the discretion to determine the weight accorded to each expert's testimony. *Gaydos v. Gaydos*, 693 A.2d 1368, 1377 (Pa. Super. Ct. 1997) (citing *Rigler v. Treen*, 660 A.2d 111, 116 (1995)). Moreover, although a court should offer an explanation of the basis of its decision, a court "need not accept even the uncontradicted opinion of an expert." *Gaydos*, 693 A.2d at 1377 (citing *Semasek v. Semasek*, 502 A.2d 109, 112 (1985)). Accordingly, the trial court is free "to accept or reject the credibility of both expert and lay witnesses, and to believe all, part, or none of the evidence." *Gaydos*, 693 A.2d at 1377-78 (citing *Murphy v. Murphy*, 599 A.2d 647, 653 (1991)). Accordingly, Mother's argument that this [c]ourt is limited in its finding without an expert is baseless. Moreover, this [c]ourt would once again note that Mother failed to preserve any argument relative to expert testimony by not making an objection on the record. *See* Pa.R.A.P. 302(a).

Second, this Court did not err because there was evidence presented that supported an emotional abuse finding relative to Mother. Notably, Mother filed several Protection from Abuse Petition[s] which thwarted the [C]hild from being able to have contact with Father for a significant amount of time. Additionally, Mother initiated or encouraged multiple members of the family to make phone calls to [C]hild [L]ine and other child protective services. There were also multiple [Children Advocacy Center (CAC)] interviews and medical exams done to [C]hild following these reports. Mother even sought to disrupt another family member[']s life, the minor child's half-sister, and had her subjected to a CAC interview. Moreover, Mother had Father's mother investigated because she was not getting the result she wanted.

It is also notable that Mother had a complaint filed against law enforcement because they failed to find sufficient evidence to pursue charges again[st] Father or Father's mother. Most importantly, the Court heard testimony regarding the minor child's older sister's interview in that the child was extremely upset solely over one interview and this [c]ourt believed [that] given [Child's] multiple interviews and the physical examination that this was extremely upsetting for the [C]hild. This testimony combined with Father's testimony about the [C]hild and his misery over this

> situation convinced this [c]ourt to make an emotional abuse finding relative to Mother. Finally, this [c]ourt would incorporate[] its rationale [in its analysis concerning Section 5328 factors].

Trial Ct. Op. at 14-16.

We agree the court's analysis. Mother provides no case law requiring expert testimony before a court may make a finding of emotional abuse under the Custody Act. Also, Mother "conflates" the court's finding of emotional abuse "under the purview of the Child Custody Act with a substantial finding of abuse under the CPSL." **K.D. v. E.D.**, ___ A.3d ___, ___, 2021 WL 5314731, at *4 (Pa. Super. 2021).

Furthermore, as will be discussed below, Mother was on notice that her purported emotional abuse of Child was at issue based on the April 1st trial proceeding. However, as pointed out by the trial court, Mother failed to preserve any argument relative to expert testimony by not making an objection on the record. **See** Pa.R.A.P. 302(a). Accordingly, she cannot now claim that court's ruling was against the weight of the evidence based on a lack of expert testimony. Thus, we discern that no relief is warranted.

In her penultimate claim, Mother alleges the trial court erred and abused its discretion by entering the April 6th interim order which she asserts "substantially" and "drastically" changed her custody rights and did not provide her with the opportunity to be heard before making such a decision. Mother's Brief at 23. Mother points out that in Pennsylvania, parties are entitled to due process in custody proceedings, and as part of that right, the

court must provide the party "an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* Mother complains that the court entered the interim order after Father had presented his witnesses and case-in-chief, but before she had an opportunity to be heard. *Id.* at 24. She also suggests that because the court referenced a "potential" finding of abuse in the order, she "had no opportunity to be heard or present any evidence to refute the 'potential' of emotional abuse." *Id.* She complains the court "stripped" her of "her due process rights during the custody proceeding and significantly reduced [her] custodial time for the next almost three . . . months." *Id.* Mother "recognize[s] that this due process violation is now technically moot for this specific case, but in the interest of future justice, believes it is important that the higher court examine and propound the guidelines for a [c]ourt to enter a temporary [o]rder before a party has had an opportunity to be heard." *Id.* at 25.

Mother is accurate on two points. First, Mother is correct that her argument is moot. The interim custody order, which Mother is challenging, was rendered moot by the entry of the final custody order. Moreover, other than a bald assertion that this claim should be reviewed because the interest of future justice is too important, Mother has not explained how the order, and issue, is subject to any of the exceptions to the mootness doctrine. *See In re Gross*, 382 A.2d 116, 119-20 (Pa. 1978).

Second, Mother is correct that she is entitled to due process with respect to custody issues. Indeed, "[f]ormal notice and an opportunity to be heard are fundamental components of due process when a person may be deprived in a legal proceeding of a liberty interest," including the custody of a child. *Everett v. Parker*, 889 A.2d 578, 580 (Pa. Super. 2005) (citation omitted). "Both notice and an opportunity to be heard must be afforded at a meaningful time in a meaningful manner." *Id.* (citations and internal quotation marks omitted). "Notice, in our adversarial process, ensures that each party is provided adequate opportunity to prepare and thereafter properly advocate its position, ultimately exposing all relevant factors from which the finder of fact may make an informed judgment." *Langendorfer v. Spearman*, 797 A.2d 303, 309 (Pa. Super. 2002) (citation omitted).

Here, the record reveals the following exchange between the court and the parties:

> [Mother's counsel]: . . . I would ask you to reconsider, because we haven't had the opportunity to hear my client's point of view yet. The only thing that linked her to these complaints that were made, Your Honor, are a statement from an estranged husband of hers and her estranged husband's mother.
>
> THE COURT: No, I understand. . . . Normally, I would not do this candidly, but it's very hard for this Judge to picture a scenario of how Mother is going to explain these things that does not involve Mother being emotionally abusive of this child given this child and others being interviewed and re interviewed and re interviewed and multiple court proceedings in which the child is put in the middle. There is always the chance that this proceeding could get continued on April 8th, things happen . . . . I want that cautionary [o]rder or change in the [o]rder in place out of an abundance of caution. If it were exactly the opposite, and I heard some

- 39 -

overwhelming evidence that Father had in fact sexually abused the child, I would be doing exactly the same thing in reverse.

[Father's counsel]: You did, Your Honor, you did the exact same thing in reverse back in 20[1]9.

THE COURT: Well, it's good to be consistent. That is my explanation. I am not reconsidering it, frankly I have been thinking about that since the lunch break.

[Mother's counsel]: Okay. Your Honor, I do -- I would just implore Your Honor that [a] finding of emotional abuse . . . I think that should come from a counselor, you know. All we've heard from Mother so far is that we did hear that there was a CAC interview in which the child, without Mother present, had made statements of allegations of abuse; and you have a mother that wants to protect her child.

[Father's counsel]: I am going to object, we're not doing closing right now.

THE COURT: Okay, let her go.

[Mother's counsel]: Okay.

THE COURT: That is fair.

[Mother's counsel]: I will keep it brief. . . . [Mother] is put in a no-win situation. Your Honor, I understand how this played out and I do get how this played out but this could have played out differently. All Mother, you know, she's hearing from a child that is tell[ing] her one thing, and right now we're all beating her up because she did something; but if it was the other way around, and I understand, I am not beating Father up, but if she had been a victim of abuse and she hadn't done anything, then she would be the bad person here for not protecting her child so she's in a no-win situation.

THE COURT: Well, I don't see it that way. [Mother's counsel], I would recommend that you may want to look at, there are at least two that I know of, [a]ppellate [c]ourt cases in Pennsylvania on emotional abuse. One of them was an appeal to the Superior Court, a decision of mine in which I was upheld, so I know [a] little something about emotional abuse. Unless Mother has some

- 40 -

awfully good explanations, I may be finding emotional abuse. I say that to help you prepare between now and [the second day of trial].

N.T., 4/1/21, at 209-11. In its corresponding temporary order, the court explained it was changing Mother's visits from unsupervised to supervised because "there [was] a potential that after hearing all of the testimony . . ., [it] may find emotional abuse by Mother." Order, 4/6/21, at 2. *See* N.T., 4/1/21, at 209.

Based on the record before us, the trial court put Mother on notice at the conclusion of the April 1, 2020, proceeding that it was not making a final determination with only having evidence from Father's case-in-chief, but it did observe some evidence to support the finding of emotional abuse. Moreover, it waited until after the second day of trial to make that determinative finding. As noted above, the second day of trial took place two months later. Mother was provided with significant time to prepare evidence and argument concerning the issue and present her case-in-chief. Accordingly, based on the record, one cannot conclude that Mother's due process rights were violated as she was given sufficient notice and an opportunity to prepare argument and introduce evidence on the issue.[15] Therefore, Mother's contention is unavailing.

_____

[15] Notably, Mother was given unsupervised custody rights in the final order despite the court's finding of emotional abuse.

Lastly, Mother asserts that based on the orders entered in this case, the trial court exhibited partiality, prejudice, bias, and ill will towards Mother. She alleges the orders "are not supported by the evidence of record and the reasoning of the [t]rial [c]ourt is manifestly unreasonable" based on the evidence presented at trial. Mother's Brief at 25. Mother references the court's entry of the April 6th interim order and states that this is the "most glaring example of prejudice or bias" because the court severely limited her custody without providing her with the opportunity to be heard. *Id.* Mother also points to the following as more examples of court's bias: (1) the court "scrawled 'denied'" on the order denying her motion for reconsideration; (2) the court warned Mother that "'incarceration [was] almost a certainty'" if she was be found in contempt again, which would be her third time; (3) the court's finding of emotional abuse against Mother because it had no basis in the law; (4) the court's order which granted Father sole legal custody of Child because there was no supporting evidence that she did not act in the best interests of Child; (5) the court's "quick rendering" of its final order which was entered only a day and a half after the trial ended which Mother suggests is evidence that the trial court had pre-determined its final decision before she even testified; and (6) the fact that the court needed to be reminded at the end of trial that there was an outstanding contempt motion, which the court quickly addressed. *Id.* at 26.

A review of the record reveals that Mother and her counsel did not protest the court's actions or request the court recuse itself due to any partiality, prejudice, bias, or ill will. As such, we find that Mother's final challenge is waived. *See* Pa.R.A.P. 302(a); *see also Fillmore v. Hill*, 665 A.2d 514, 515-16 (Pa. Super. 1995) ("[I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. . . . On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.") (citations omitted). Moreover, even if Mother had properly preserved this claim, we would deem it to be without merit. As analyzed above, a review of the record reveals the court's findings and determinations are supported by competent evidence.[16]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/03/2022

---

[16] It merits mention that the trial court found waiver regarding several of Mother's claims while we addressed the merits. Nevertheless, "we are not bound by the rationale of the trial court and may affirm on any basis." *Richmond v. McHale*, 35 A.3d 779, 786 (Pa. Super. 2012) (citation omitted).